# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **DEBORAH RANDALL**, a Minnesota resident; **STILLWATER LADIES, INC.**, a Minnesota corporation; **BARBARA J. WRIGHT**, a Minnesota resident; **DAVID WRIGHT**, a Minnesota resident; **FLAMINGO EXPRESS, INC.**, a Minnesota corporation; **ROBIN ALLANSON**, a Minnesota resident; **LEO NEUDECKER**, a Minnesota resident; **AUDREY HOGLUND-ROSS**, a Minnesota resident; **ANGIE WEEKS**, a Minnesota resident, and **MICHELLE EVANS**, a Minnesota resident. | ) ) ) ) ) ) ) ) ) ) ) ) ) | **Court File No. 04-3394 JRT/FLN**<br><br>**FIRST AMENDED COMPLAINT** |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | **JURY TRIAL DEMANDED** |
| **LADY OF AMERICA FRANCHISE CORPORATION**, a Florida corporation, and **ROGER WITTENBERNS**, a Florida resident, | ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs Deborah Randall ("Randall"), Stillwater Ladies, Inc. ("Stillwater Ladies") Barbara J. and David Wright ("the Wrights"), Flamingo Express, Inc. ("Flamingo Express"), Robin Allanson ("Allanson"), Leo Neudecker ("Neudecker"), Audrey Hoglund-Ross ("Hoglund-Ross"), Angie Weeks ("Weeks"), and Michelle Evans ("Evans") (collectively "Plaintiffs") for their Complaint against Defendant Lady of America Franchise Corporation ("Lady of America") and its President and Chief Executive Officer, Roger Wittenberns ("Wittenberns"), (collectively "Defendants") state and allege as follows:

1

## INTRODUCTION

1.      Plaintiffs made substantial investments in franchise opportunities marketed by Lady of America.

2.      As described more fully below, Plaintiffs were sold their respective Lady of America franchises illegally and through false and misleading statements (and material omissions of facts that were necessary in order to make other representations not misleading).

3.      Notably, in order to induce Plaintiffs to sign their respective franchise agreements with Lady of America, Lady of America presented Plaintiffs with a host of illegal "earnings claims" and false promises of training and support, as more fully described infra.

4.      Plaintiffs reasonably relied on the foregoing representations by Lady of America and, accordingly, made substantial monetary investments in their respective Lady of America franchises.

5.      However, Plaintiffs never enjoyed the promised financial returns on their Lady of America franchises, and Lady of America also failed to deliver on promised training and on-going support.

6.      Plaintiffs have also discovered that Lady of America accepted undisclosed vendor rebates and that Lady of America used such rebates strictly for its own benefit.

7.      Plaintiffs bring this action to recover from Lady of America the money that Plaintiffs invested in their Lady of America franchises.

8.      Plaintiffs also seek to recover their damages from Lady of America's principal executive officer, Roger Wittenberns, who, upon information and belief, knowingly and willfully directed the unlawful conduct of Lady of America's franchise sales team.

2

**THE PARTIES**

9.     Plaintiffs Barbara J. and David Wright, both Minnesota residents, are former franchisees of the Lady of America system.  The Wrights invested in a Maplewood, Minnesota Lady of America franchised location operated under the name "Ladies Workout Express."

10.     Plaintiffs Deborah Randall, a resident of the State of Minnesota, and Stillwater Ladies, Inc., a Minnesota corporation, are former franchisees of the Lady of America system.  Randall and Stillwater Ladies invested in and operated a Stillwater, Minnesota Lady of America franchised location under the name "Ladies Workout Express."

11.     Plaintiff Flamingo Express, Inc., a Minnesota corporation, was, upon information and belief, a former franchisee of the Lady of America system.  Flamingo Express operated an Edina, Minnesota Lady of America franchised location under the name "Edina Ladies Workout Express" along with co-franchisee Robin Allanson, the sole principal and investor of said franchise.

12.     Plaintiff Leo Neudecker, a Minnesota resident, is, upon information and belief, a franchisee of the Lady of America system.  Neudecker operated a Crystal, Minnesota Lady of America franchised location under the name "Ladies Workout Express" and a Mounds View, Minnesota franchised location under the name "Ladies Workout Express."

13.     Plaintiffs Audrey Hoglund-Ross, a Minnesota resident, and Angie Weeks, a Minnesota resident, are franchisees of the Lady of America system.  Hoglund-Ross and Weeks invested in and operated a Columbia Heights, Minnesota franchised location under the name "Ladies Workout Express" and a New Brighton, Minnesota franchised location under the name "Ladies Workout Express."

14.     Plaintiff Michelle Evans, a Minnesota resident, is a franchisee of the Lady of America system.  Evans invested in and operated a Roseville, Minnesota franchised location under the name "Ladies Workout Express."

15.     Defendant Lady of America Franchise Corporation is a Delaware corporation with a principal place of business at 500 E. Broward Boulevard, Suite 1650, Fort Lauderdale, Florida 33394.  Defendant operates the Lady of America franchise system including all franchises operating under the "Ladies Workout Express" format.  (Defendant Lady of America also operates franchises under the names "Lady of America," "Workout Express," and "Health Clubs of America.")

16.     Defendant Roger Wittenberns, a resident of the State of Florida, is the President and Chief Executive Officer of Lady of America.  Upon information and belief, Wittenberns controlled the unlawful conduct of Lady of America, as more fully described herein.

## JURISDICTION AND VENUE

17.     Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a) and pursuant to principles of supplemental jurisdiction, 28 U.S.C. § 1367.

18.     The amount in controversy is reasonably believed to be substantially in excess of $75,000.

19.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a)(2).

20.     Upon information and belief, each of the Plaintiffs' respective franchise agreements also allow for disputes between the franchisee and Lady of America to be resolved before the courts of the State of Minnesota.

4

**BACKGROUND FACTS RELATED TO RANDALL'S AND STILLWATER LADIES'
INVESTMENT IN LADY OF AMERICA'S "LADIES WORKOUT EXPRESS"
FRANCHISE SYSTEM**

21.     Randall first began investigating the prospect of owning and operating a health club franchise in early 2002.

22.     Randall had a particular interest in operating a fitness club exclusively for use by women.

23.     Randall initiated due diligence with respect to a number of franchise concepts.

24.     Randall was familiar with the popular "Curves" franchise system operated by Curves International, Inc.

25.     The Curves franchise system calls for the operation of a fitness center exclusively for women emphasizing a 30 minute circuit training regimen.

26.     Randall spoke to a representative of the Curves system in February/March 2002 about the possibility of opening a franchised location but was told that no franchised locations of that system were available for operation within the State of Minnesota.

27.     At or about that time, Randall also began reviewing the possibility of opening a "Ladies Workout Express" franchise through Lady of America.

28.     Like the Curves concept, the "Ladies Workout Express" franchise concept involves the operation of fitness centers exclusively for women emphasizing a 30 minute circuit training regimen.

29.     As more fully set forth herein, Lady of America representatives made a host of fraudulent misrepresentations to Randall in order to induce her into investing in Lady of America's franchise system.

5

30.     Lady of America also failed to fully disclose the extent and nature of the vendor rebates that Lady of America planned to and would accept once Randall invested in Lady of America's franchise system.

31.     Randall's initial contact with Lady of America was with former Lady of America Senior Vice President Bill Landman.

32.     Randall contacted Landman in or about the first two weeks of March 2002.

33.     During the course of their telephone conversation, Landman represented to Randall that, in the event that Randall purchased a "Ladies Workout Express" franchise:

        a.      a corporate representative would be assigned to assist Randall in the operation of her franchise;

        b.      Randall would see 100 new members upon opening her franchise;

        c.      Randall would "break even" within 3 months of operation (i.e., recover all investment costs associated with the build-out of the franchise); and

        d.      Randall would begin enjoying profits on the operation of the franchise within 6 months.

34.     Landman further indicated that Lady of America was planning several nationwide advertising plans that would help push the "Ladies Workout Express" concept ahead of other franchise concepts operated in the State of Minnesota, including but not limited to the "Curves" concept.

35.     At the close of their conversation, Landman directed Randall to contact Lady of America representatives Ann Power and Mark Camara for further information regarding franchise opportunities.

36.     In Randall's subsequent telephone conversations with both Power and Camara, in or about the first two weeks of March 2002, Power and Camara confirmed all of the above-described statements by Landman.

37.     Power added to Randall that, "If you follow our system plan, you should have 100 new members during the presale phase of operations."

38.     Both Power and Landman represented to Randall, in or about the first two weeks of March 2002, that:

    a.     Lady of America had laid the groundwork to begin a national advertising campaign that would "put Curves out of business;"

    b.     Lady of America was the number one franchise in the country, not the system operated by Curves International, Inc.;

    c.     Lady of America's franchised "Ladies Workout Express" concept was growing faster than the similar concept franchised by Curves International, Inc.;

    d.     Existing members of area "Curves" franchises would come flocking to any "Ladies Workout Express" opened by Randall because "Curves uses inferior equipment and services;"

    e.     Lady of America would provide Randall with on-going support before and after opening of the franchised location; and

    f.     Lady of America was sending staff to the State of Minnesota to begin the push to make Lady of America the dominant franchise within the State of Minnesota.

39.     Landman, Power, and Camara each cautioned Randall that she could purchase a "Ladies Workout Express" franchise opportunity within the State of Minnesota, but only so long as she acted quickly to secure a franchise; all three representatives cautioned Randall that remaining franchise locations within the State of Minnesota were being booked quickly by other prospective franchisees.

40.     Landman, Power, and Camara repeatedly (and favorably) compared its "Ladies Workout Express" concept with the similar franchised concept marketed by Curves International, Inc.

41.     Prior to signing her written franchise agreement with Lady of America, Randall asked Power what total dollar investment Randall would be required to make to operate a "Ladies Workout Express" franchise.  Power said it would cost Randall merely $25,000 to $30,000; when Randall replied that she could not afford to invest more than that amount, Power reassured Randall that Power's cost estimate was accurate and reliable.

42.     In light of the results of her investigation of Lady of America franchise concept, Randall signed up to watch an Internet-based "Discovery Day" presentation by Lady of America.

43.     That "Discovery Day" presentation viewed via Internet by Randall featured a series of graphics compiled by Lady of America suggesting that existing Lady of America franchisees were all turning a profit by their sixth month of operation.

44.     As a further inducement to cause Randall to sign on as a franchisee, Camara represented that Randall would receive $10,000 from her landlord upon leasing space for a "Ladies Workout Express" franchise.  Camara advised Randall that she would be able to invest that sum in a renovation of her leasehold premises.

8

45.     All of the above-described statements by Lady of America were made to Randall in order to induce Randall to invest in a Lady of America franchise concept.

46.     Randall reasonably relied on the foregoing representations by Lady of America in making her decision to invest in the Lady of America franchise concept.

47.     Lady of America presented Randall with the Uniform Franchise Offering Circular ("UFOC") attached hereto as Exhibit A in or about March 2002.

48.     Item 19 of the UFOC received by Randall states that Lady of America ". . . does not furnish or authorize its salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of your Franchise.  Actual results vary from Franchise to Franchise, and we cannot estimate the results of any particular franchise."  (See the UFOC presented to Randall at page 58.)

49.     Item 19 is inaccurate in that Lady of America representatives, as described herein, make a practice of making "earnings claims" outside the context of the UFOC (i.e., illegal "earnings claims").

50.     Upon information and belief, Lady of America also failed to disclose in the UFOC the full extent of the vendor rebates and/or premiums which Lady of America receives from vendors with whom franchisees, including Randall, have dealt at the direction of Lady of America.  (All information related to such vendor rebates is required to be disclosed at Item 8 of the UFOC.)

51.     Upon information and belief, Randall signed a written franchise agreement with Lady of America in or about the first week of April 2002 pursuant to which Randall and/or Stillwater Ladies, Inc. were given the right to operate a "Ladies Workout Express" in Stillwater, Minnesota.

52.     Randall also made a payment of $12,500 in the summer of 2002 for the right to develop a franchised "Ladies Workout Express" location in Woodbury, Minnesota.

53.     Randall opened the "Ladies Workout Express" in Stillwater, Minnesota in or about September 2002.

54.     The build-out of the Stillwater, Minnesota "Ladies Workout Express" franchise cost substantially more than the cost estimates provided to Randall by Lady of America prior to investment in the franchise.

55.     Randall received exceedingly poor service from the approved vendors which Lady of America directed Randall to utilize in connection with her operation of the franchise.

56.     Moreover, the promised customer base and revenues never materialized for Randall's Stillwater, Minnesota franchise.

57.     Over the course of operation of the franchise, Randall's franchise did not see even moderate customer base growth (let alone a massive influx of new customers upon the opening of the franchise).

58.     Despite repeated requests for assistance, Lady of America failed to make good on its promises to: (a) provide meaningful assistance with the franchise opening; or (b) provide national and local advertising.

59.     Indeed, Lady of America's Larry Sargent, in response to a telephone call from Randall inquiring about the lack of any national or local advertising by Lady of America, told Randall that the Minnesota franchisees were "on their own" (i.e., suggesting that Lady of America would not be providing the Minnesota franchisees with any meaningful advertising assistance).

60.     Neither Randall's "Ladies Workout Express" nor other Lady of America franchise concepts operated within the State of Minnesota have competed favorably with the local Curves International, Inc. franchises.

61.     All Minnesota "Ladies Workout Express" franchisees suffered from the lack of name recognition for the concept; upon information and belief, "Ladies Workout Express" franchisees would have enjoyed substantially more name recognition had Lady of America made good on its promises of national and local advertising assistance.

62.     Despite her efforts to subsidize the operation of the franchise for a period of time, Randall was unable to sustain the continued operation of the Stillwater, Minnesota franchise and was forced to close the franchise in the summer of 2004.

63.     Randall has since discovered that Lady of America was paid $10,000 by Randall's landlord (for leased space in Stillwater, Minnesota) upon Randall's signing a long-term lease; Lady of America did not disclose to Randall that Lady of America would be paid such a fee.  (Lady of America had, as described supra, advised Randall that she would be receiving the payment of $10,000 to invest in her leased business premises.)

64.     Subsequent to the closing of her "Ladies Workout Express" franchise, Lady of America sent Randall a letter dated June 17, 2004 stating that, due to the closure of her franchise, "Royalties for over 8 years are now owed to Lady of America Franchise Corporation."

65.     Randall and Stillwater Ladies seek damages based upon the above-described conduct of Lady of America.

66.     Randall and Stillwater Ladies also seek damages from Defendant Wittenberg who is, upon information and belief, the "control person" orchestrating Lady of America's deceptive sales practices.

## BACKGROUND FACTS RELATED TO ALLANSON'S AND FLAMINGO EXPRESS' INVESTMENT IN LADY OF AMERICA'S "LADIES WORKOUT EXPRESS" FRANCHISE SYSTEM

67.     Allanson first began investigating the prospect of owning and operating a health club franchise in April 2002.

68.     Like Randall, Allanson had a particular interest in operating a fitness club exclusively for use by women and was familiar with the popular "Curves" franchise system operated by Curves International, Inc.

69.     Because of the similarity between the two concepts, Allanson began reviewing the possibility of opening a "Ladies Workout Express" franchise through Lady of America.

70.     As more fully set forth herein, Lady of America representatives made a host of fraudulent misrepresentations to Allanson in order to induce her into investing in Lady of America's franchise system.

71.     Lady of America also failed to fully disclose the extent and nature of the vendor rebates that Lady of America planned to and would accept once Allanson invested in Lady of America's franchise system.

72.     Allanson's initial contact with Lady of America was with Lady of America employees Power, Marc DeCarlo, and Elliot Melement.

73.     Allanson spoke to these individuals by telephone in or about April 2002.

12

74.     During the course of their telephone conversations with Allanson, the foregoing individuals represented to Allanson that, in the event that Allanson purchased a "Ladies Workout Express" franchise for operation in Edina, Minnesota:

    a.      a corporate representative would be assigned to assist her in the operation of her franchise;

    b.      the "Ladies Workout Express" franchise was a "turn key" business;

    c.      100 members would sign up in the first month of operation;

    d.      there was no reason Allanson shouldn't expect to quickly achieve a membership base of 800 to 1,000 members;

    e.      Allanson would recover her entire investment in the franchise and begin enjoying profits within 6 months;

    f.      Lady of America would provide Allanson with on-going support before and after opening of the franchised location;

    g.      Lady of America was sending staff to the State of Minnesota to begin the push to make Lady of America the dominant franchise within the State of Minnesota; and

    h.      Allanson's total investment in such a franchise would be limited to $30,000.

75.     Allanson was further told that Lady of America was planning several nationwide advertising plans that would help push the "Ladies Workout Express" concept ahead of other franchise concepts operated in the State of Minnesota, including but not limited to the "Curves" concept.

13

76.     Power, DeCarlo, Melement, and Camara each cautioned Allanson that she could purchase a "Ladies Workout Express" franchise opportunity within the State of Minnesota, but only so long as she acted quickly to secure a franchise; all three representatives cautioned Allanson that remaining franchise locations within the State of Minnesota were being booked quickly by other prospective franchisees.

77.     Camara further represented that Lady of America would assist Allanson with the negotiation of the lease for her franchised location.

78.     In light of the results of her investigation of Lady of America franchise concept, Allanson proceeded to attend a "Discovery Day" put on by Lady of America at Lady of America's franchise headquarters in Fort Lauderdale, Florida in the summer of 2002.

79.     Allanson flew to Fort Lauderdale from the State of Minnesota at her own expense to attend.

80.     During the course of the "Discovery Day" presentation made by Lady of America, Lady of America's representatives made a slide presentation suggesting that existing Lady of America franchisees were all turning a profit by their sixth month of operation; other slides highlighted the performance of (an unrepresentative group of) franchisees measured by both membership totals and revenues.

81.     The "Discovery Day" slide presentation made to Allanson also highlighted the experience of a Joliet, Illinois Lady of America franchisee that had been enjoying revenues in excess of $20,000 per month.

82.     All of the above-described representations by Lady of America were made to Allanson in order to induce Allanson to invest in a Lady of America franchise concept.

14

83.     Allanson reasonably relied on the foregoing representations by Lady of America in making her decision to invest in the Lady of America franchise concept.

84.     Lady of America presented Allanson with the Uniform Franchise Offering Circular ("UFOC") attached hereto as Exhibit B in or about May/June 2002.

85.     Item 19 of the UFOC received by Allanson states that Lady of America ". . . does not furnish or authorize its salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of your Franchise.  Actual results vary from Franchise to Franchise, and we cannot estimate the results of any particular franchise."

86.     Item 19 is inaccurate in that Lady of America representatives, as described herein, make a practice of making "earnings claims" outside the context of the UFOC (i.e., illegal "earnings claims").

87.     Upon information and belief, Lady of America also failed to disclose in the UFOC the full extent of the vendor rebates and/or premiums which Lady of America receives from vendors with whom franchisees, including Allanson, has dealt at the direction of Lady of America.  (All information related to such vendor rebates is required to be disclosed at Item 8 of the UFOC.)

88.     Upon information and belief, Allanson signed a written franchise agreement with Lady of America in or about May/June 2002 pursuant to which Allanson and/or Flamingo Express were given the right to operate a "Ladies Workout Express" in Edina, Minnesota.

89.     Allanson had initially selected a franchise location suited to cultivating the St. Louis Park/Minnetonka (Minnesota) market, but Camara insisted that the demographics of the Edina location were unbeatable.

90.     In reliance on Camara's representation, Allanson opened her "Ladies Workout Express" in Edina, Minnesota in or about August 2002.

91.     The build-out of the Edina, Minnesota "Ladies Workout Express" franchise cost substantially more than the cost estimates provided to Allanson by Lady of America prior to investment in the franchise.

92.     Allanson received exceedingly poor service from the approved vendors which Lady of America directed Allanson to utilize in connection with her operation of the franchise.

93.     Moreover, the promised customer base and revenues never materialized for Allanson's Edina, Minnesota franchise.

94.     Over the course of operation of the franchise, Allanson's franchise did not see even moderate customer base growth (let alone a massive influx of new customers upon the opening of the franchise).

95.     Despite repeated requests for assistance, Lady of America failed to make good on its promises to: (a) provide meaningful assistance with the franchise opening; or (b) provide national and local advertising.

96.     Despite her efforts to subsidize the operation of the franchise for a period of time, Allanson was unable to sustain the continued operation of the Edina, Minnesota franchise and was recently forced to close the franchise.

97.     Allanson has since discovered that Lady of America was paid $2,500 by Allanson's landlord (for leased space in Edina, Minnesota) upon Allanson's signing a long-term lease; Lady of America did not disclose to Allanson that Lady of America would be paid such a fee.

98.     Allanson and Flamingo Express seek damages based upon the above-described conduct of Lady of America.

99.     Allanson and Flamingo Express also seek damages from Defendant Wittenberg who is, upon information and belief, the "control person" orchestrating Lady of America's deceptive sales practices.

## BACKGROUND FACTS RELATED TO THE WRIGHTS' INVESTMENT IN LADY OF AMERICA'S "LADIES WORKOUT EXPRESS" FRANCHISE SYSTEM

100.     The Wrights first began investigating the prospect of their owning and operating a health club franchise in the summer of 2002.

101.     Like Randall and Allanson, the Wrights had a particular interest in operating a fitness club exclusively for use by women.

102.     The Wrights initiated due diligence with respect to a number of franchise concepts.

103.     The Wrights were familiar with the popular "Curves" franchise system operated by Curves International, Inc.

104.     The Wrights spoke to a representative of the Curves system in the summer of 2002 but were told that no franchised locations of that system were available for operation within the State of Minnesota.

105.     At of about that time, the Wrights also began reviewing the possibility of opening a "Ladies Workout Express" franchise through Lady of America.

106.     After reviewing Lady of America's website, David Wright contacted a marketing representative of Lady of America by telephone to further inquire about franchise opportunities within the State of Minnesota.

107.     During the course of David Wright's telephone conversation with the Lady of America representative, the representative informed David Wright that:

> a.     the Wrights could obtain a franchise within the State of Minnesota, but only so long as the Wrights acted quickly to secure such a franchise; the Lady of America representative cautioned David Wright that remaining franchise locations within the State of Minnesota were being booked quickly by other prospective franchisees;
>
> b.     the State of Minnesota was a particularly "hot market" and that the Wrights would do very well financially with the operation of a Lady of America franchise if they acted quickly to secure a franchised location;
>
> c.     Lady of America was in the process of expanding throughout the country based on the "huge demand" for franchises nationwide; and
>
> d.     "between you and me, this franchise is a gold mine!"

108.     In light of the results of the Wrights' investigation of Lady of America franchise concept, David Wright proceeded to attend the June 2002 "Discovery Day" put on by Lady of America at Lady of America's franchise headquarters in Fort Lauderdale, Florida.

109.     David Wright flew to Fort Lauderdale from the State of Minnesota at his own expense to attend Lady of America's "Discovery Day" in June 2002.

110.     During the course of his visit for "Discovery Day," David Wright:

      a.      was given a brief tour of Lady of America' headquarters;

      b.      was shown a video taped presentation regarding the franchised business; and

      c.      met with a series of Lady of America's representatives.

111.    During the course of David Wright's meeting with Lady of America Marketing Director Jeff Green, Green represented to David Wright that:

      a.      the "Ladies Workout Express" franchise concept was the hottest growing business in the industry;

      b.      Lady of America expected to have "sold out" of available franchise locations within the State of Minnesota within a few months;

      c.      the cost of opening just a single club would be roughly $25,000;

      d.      the "Ladies Workout Express" was the smallest size club (among the Lady of America franchised fitness center concepts) and, accordingly, the least expensive to operate;

      e.      Lady of America had vendors in place who would finance the equipment, carpet, tanning beds, and any other items needed to get the franchise running; and

      f.      the "Ladies Workout Express" franchise was a "turn key package."

112.    Other Lady of America representative with whom David Wright met during the course of his "Discovery Day," including Bill Landman, Larry Sargent and Charles Cavuoto, continued to pitch the franchise concept to David Wright:

a.      Landman said that a corporate representative would be assigned to any franchise purchased by the Wrights to offer assistance and engage in trouble-shooting;

b.      Landman further indicated that Lady of America was planning several nationwide advertising plans that would help push the "Ladies Workout Express" concept ahead of other franchise concepts operated in the State of Minnesota, including but not limited to the "Curves" concept;

c.      Landman represented that a regional Lady of America director would be on hand at the opening of any franchise purchased by the Wrights;

d.      Landman also stated that, if the Wrights' finances were to get tight, Lady of America would reduce the monthly royalty payments made to Lady of America;

e.      Sargent stated that the Wrights should expect a massive client turnout for the Grand Opening of any "Ladies Workout Express" in the State of Minnesota;

f.      Sargent quantified that anticipated turnout, stating that 100 to 150 people would, not only show up, but sign up during the opening phase and, after completion of the opening, the Wrights could expect 15 to 20 people per week to sign on;

g.      Sargent told David Wright that Lady of America would organize free press and public relations for the Wrights in the area in order to assist with the Grand Opening;

20

h.     Sargent represented that, with the above-described turnout, the Wrights could reasonably anticipate being in great financial shape only a few months into their operation of a "Ladies Workout Express;" and

i.     Sargent explained that Lady of America contracted with a vendor named Fit Check who would handle all membership contracts and give the Wrights' clients excellent service.

113.    Sargent further shared with David Wright revenue figures being earned at existing franchises and stated that such financial figures should give the Wrights a sense of what type of revenues they should anticipate upon opening a "Ladies Workout Express" franchise; such figures were based on the unrepresentative performance of a select group of high-performing franchises.

114.    Lady of America representatives showed David Wright documentation showing the "Top Ten" club revenues.

115.    The financials of other existing franchises showed revenues well over $10,000 a month; Sargent also spoke of franchises being operated in Puerto Rico which were enjoying revenues of $23,000 per month.

116.    During the course of the "Discovery Day," David Wright repeatedly asked about challenges that the Wrights might reasonably anticipate facing with the operation of a "Ladies Workout Express" franchise.   Each time his question was answered by Lady of America representatives to the effect that, "we'll be there with you every step of the way."

117.    Sargent, more specifically, said that everyone at Lady of America's corporate headquarters had years of experience such that there was nothing with which Lady of America would not be able to assist the Wrights.

21

118.    The day immediately following David Wright's "Discovery Day" at Lady of America headquarters, a Lady of America representative took David Wright to a local "Ladies Workout Express" franchise in Deerfield Beach, Florida.

119.    The Deerfield Beach franchise appeared to David Wright to be a thriving franchise.

120.    David Wright was, furthermore, told by the Lady of America representative who accompanied him to the Deerfield Beach location that the Deerfield Beach franchise had earned upwards of $40,000 a month in revenues.

121.    The Lady of America representative who took David Wright to the Deerfield Beach franchise, moreover, told David Wright that he should expect to have a similarly thriving franchise in the State of Minnesota.

122.    All of the above-described statements by Lady of America were made to the Wrights in order to induce the Wrights to invest in a Lady of America franchise concept.

123.    The Wrights reasonably relied on the foregoing representations by Lady of America.

124.    Before closing out his "Discovery Day" trip, David Wright signed for the Uniform Franchise Offering Circular ("UFOC") attached hereto as Exhibit C.  At that time, Lady of America representatives told David Wright that he would have a "very limited time" to review the UFOC.

125.    Item 19 of the UFOC received by David Wright states that Lady of America ". . . does not furnish or authorize its salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of your Franchise.  Actual results vary from Franchise to Franchise, and we cannot estimate the results of any particular franchise."  (See the UFOC given to the Wrights, attached as Exhibit C hereto, at page 57.)

126.    Item 19 is inaccurate in that Lady of America representatives, as described herein, make a practice of making "earnings claims" outside the context of the UFOC (i.e., illegal "earnings claims").

127.    Upon information and belief, Lady of America also failed to disclose in the UFOC the full extent of the vendor rebates and/or premiums which Lady of America receives from vendors with whom franchisees, including the Wrights, have dealt at the direction of Lady of America.  (All information related to such vendor rebates is required to be disclosed at Item 8 of the UFOC.)

128.    The Wrights and their business partners signed the Franchise Agreement (set forth as Exhibit B within the UFOC) on or about August 6, 2002 for the operation of their "Ladies Workout Express."

129.    The Wrights and their business partners opened a "Ladies Workout Express" franchise later that year in suburban Maplewood, Minnesota.

130.    The build-out of the Wrights' "Ladies Workout Express" franchise cost substantially more than the cost estimates provided to the Wrights by Lady of America prior to the Wrights' investing in the franchise.

131.    The Wrights received exceedingly poor service from the approved vendors which Lady of America directed the Wrights to utilize in connection with the operation of their franchise.

132.    Moreover, the promised customer base and revenues never materialized for the Wright's Maplewood, Minnesota franchise.

133.    Over the course of operation of the franchise, the Wrights' franchise did not see even moderate customer base growth (let alone a massive influx of new customers upon the Grand Opening of the franchise).

23

134.     Despite repeated requests for assistance, Lady of America failed to make good on its promises to: (a) provide meaningful assistance with the Grand Opening; (b) garner free press for the Grand Opening; and (c) provide national and local advertising.

135.     Despite the financial difficulties suffered by the Wrights in the operation of their "Ladies Workout Express" franchise, Lady of America reneged on its earlier promise to reduce the royalties payable to Lady of America.

136.     Despite their efforts to subsidize the operation of the franchise for a period of time, the Wrights were unable to sustain the continued operation of the Maplewood, Minnesota franchise and were forced to close the franchise in the summer of 2004.

137.     At or about the time of the Wrights' closing the franchise, the lessor of their franchised location indicated to the Wrights that it was his understanding that Lady of America was "writing Minnesota off" as a market for their franchise concepts.

138.     The Wrights seek damages from Lady of America based upon Lady of America's above-described conduct.

139.     The Wrights also seek damages from Defendant Wittenberg who is, upon information and belief, the "control person" orchestrating Lady of America's deceptive sales practices.


**BACKGROUND FACTS RELATED TO NEUDECKER'S INVESTMENT IN LADY OF AMERICA'S "LADIES WORKOUT EXPRESS" FRANCHISE SYSTEM**

140.     Neudecker first began investigating the prospect of owning and operating a health club franchise in or around April 2002.

141.    Neudecker had a particular interest in operating a fitness club exclusively for use by women.

142.    Neudecker initiated due diligence by conducting research, via the Internet, with respect to a number of franchise concepts.

143.    Neudecker looked into the potential for a purchase of a "Curves"-brand franchise but was informed that no further opportunities existed within the State of Minnesota within that system.

144.    Neudecker decided to enter into a franchise agreement with Lady of America because based upon his research and conversations with Lady of America representatives, "Lady Workout Express" seemed to be the best franchise system available.

145.    As more fully set forth herein, Lady of America representatives made a host of fraudulent misrepresentations to Neudecker in order to induce him into investing in the Lady of America's franchise system.

146.    Lady of America also failed to fully disclose the extent and nature of the vendor rebates that Lady of America planned to and would accept once Neudecker invested in Lady of America's franchise system.

147.    Neudecker initially spoke with Lady of America representative Camara in early 2002 about the possibility of opening a Lady of America franchise location.

148.    During the course of their conversation, Camara encouraged Neudecker to attend "Discovery Day" in Fort Lauderdale, Florida.

149.    Based upon his conversation with Camara, Neudecker attended "Discovery Day" in or around June, 2002.

150.    At "Discovery Day" Camara, and other Lady of America representatives including Landman and Cavuoto represented to Neudecker that, in the event that Neudecker purchased a "Ladies Workout Express" franchise:

   a.    a corporate representative would be assigned to assist Neudecker in the operation of his franchise;

   b.    Neudecker would "break even" after 110-120 members were enrolled in his Lady of America franchise;

   c.    Neudecker would see 100 members enroll at his presale event;

   d.    Many existing "Curves" members would drop their "Curves" membership and purchase a membership at his club;

   e.    Neudecker could open and start operating his "Ladies Workout Express" for $18,900;

   f.    Neudecker could be the on-site owner/manager (despite his being male);

   g.    Neudecker would be earning a profit within six months; and

   h.    Lady of America representatives would work hard on his behalf to locate and negotiate the best possible lease.

151.    During the course of "Discovery Day" presentation made by Lady of America, Lady of America's representatives made a slide presentation suggesting that existing Lady of America franchisees were all turning a profit and had acquired 500-1000 customers.

152.    Lady of America presented Neudecker with a Uniform Franchise Offering Circular ("UFOC") attached hereto as Exhibit D in or about July 2002.

153.     Item 19 of the UFOC received by Neudecker states that Lady of America ". . . does not furnish or authorize its salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of your Franchise.  Actual results vary from Franchise to Franchise, and we cannot estimate the results of any particular franchise."  (See the UFOC presented to Neudecker at page 57).

154.     Item 19 is inaccurate in that Lady of America representatives, as described herein, make a practice of making "earnings claims" outside the context of the UFOC (i.e., illegal "earnings claims").

155.     Upon information and believe, Lady of America also failed to disclose in the UFOC the full extent of the vendor rebates and/or premiums which Lady of America receives from vendors with whom franchisees, including Neudecker, have dealt at the direction of Lady of America.  (All information related to such vendor rebates is required to be disclosed at Item 8 of the UFOC).

156.     After attending "Discovery Day" and talking with the representatives for Lady of America, Neudecker decided to purchase four "Ladies Workout Express" franchises ("four-pack") from Lady of America.

157.     Camara began negotiating a lease on Neudecker's behalf, however when Neudecker stated that he was not happy with the location, Camara stated that Neudecker better act quickly and take this location because the remaining franchised locations within the State of Minnesota were being booked quickly.

158.     Neudecker opened a "Ladies Workout Express" in Crystal, Minnesota in or about November 2002.

159.     In or about February 2003, Neudecker opened his second "Ladies Workout Express" in Mounds View, Minnesota.

160.     The build-out of the Crystal, Minnesota and Mounds View, Minnesota "Ladies Workout Express" franchises cost substantially more (approximately $94,000 more) than the cost estimates provided to Neudecker by Lady of America prior to investment in the franchise.

161.     Moreover, the promised revenues never materialized for either the Crystal or the Mounds View, Minnesota franchised locations.

162.     In fact, Neudecker acquired 120 customers for his Crystal, Minnesota location within the first ten months of operation; however, he did not "break even" as represented by Lady of America.

163.     Over the course of operation of the franchise, Neudecker's franchise did not see the customer base growth as represented at "Discovery Day."

164.     Due to the fact that neither of Neudecker's "Ladies Workout Express" locations acquired the customer base or revenue as represented by Lady of America, Neudecker did not open the remaining two "Ladies Workout Express" franchises.

165.     Neither Neudecker's "Ladies Workout Express" nor other Lady of America franchise concepts operated within the State of Minnesota have competed favorably with the other fitness clubs located in Minnesota, forcing the closure of both of Neudecker's clubs.

166.     Despite repeated requests, Lady of America failed to make good on its promise to provide meaningful assistance, support and training to Neudecker's two franchised locations.

167.     Neudecker seeks damages based upon the above-described conduct of Lady of America.

168.     Neudecker also seeks damages from Defendant Wittenberg who is, upon information and belief, the "control person" orchestrating Lady of America's deceptive sales practices.

## BACKGROUND FACTS RELATED TO HOGLUND-ROSS AND WEEKS' INVESTMENT IN LADY OF AMERICA'S "LADIES WORKOUT EXPRESS" FRANCHISE SYSTEM

169.     Hoglund-Ross and Weeks first began investigating the prospect of owning and operating a health club franchise in early 2001.

170.     Hoglund-Ross and Weeks had a particular interest in operating a fitness club exclusively for use by women.

171.     Hoglund-Ross and Weeks initiated due diligence with respect to a number of franchise concepts.

172.     Hoglund-Ross and Weeks investigated many fitness club franchises which focused exclusively for use by women including Contours Express and Shape Up For Women.

173.     At or about this same time, Hoglund-Ross and Weeks also began reviewing the possibility of opening a "Ladies Workout Express" franchise through Lady of America.

174.     Similar to the other women-only fitness club franchises that Hoglund-Ross and Weeks investigated, the "Ladies Workout Express" franchise concept involves the operation of a fitness center exclusively for women emphasizing a 30 minute circuit training regimen.

175.     Because Lady of America's alleged start-up costs were far lower than the start-up costs estimated by other franchises, Hoglund-Ross and Weeks decided to enter into a franchise agreement with Lady of America.

176.    As more fully set forth herein, Lady of America representatives made a host of fraudulent misrepresentations to Hoglund-Ross and Weeks in order to induce them into investing in Lady of America's franchise system.

177.    Lady of America also failed to fully disclose the extent and nature of the vendor rebates that Lady of America planned to and would accept once Hoglund-Ross and Weeks invested in Lady of America's franchise system.

178.    Lady of America was not, upon information and belief, registered to market franchises in early 2001 within the State of Minnesota; Lady of America was, nevertheless, marketing its franchises within the State of Minnesota in early 2001.

179.    Hoglund-Ross and Weeks began researching and gathering information about the Lady of America franchise system through its website.

180.    Specifically, Hoglund-Ross and Weeks printed information about the "Lady Workout Express" franchise system from Lady of American's website.  This information represented that :

      a.      Hoglund-Ross and Weeks could be in business within 90 days for the sum of $18,900 which includes the cost of equipment, posters, charts, manuals and start-up advertising;

      b.      Hoglund-Ross and Weeks could expect $100,000 in pre-grand opening sales;

      c.      Hoglund-Ross and Weeks would receive ongoing support and training;

      d.      rent for a "Ladies Workout Express" location averaged between $1000 to $2000 per month; and

      e.      Hoglund-Ross and Weeks' royalty percentage would be reduced by 50% (from 10% to 5%) after 24 months.

181.   Hoglund-Ross and Weeks requested, through the Lady of America website, to receive information directly from the franchisor regarding the Lady of America franchise system.

182.   Hoglund-Ross and Weeks' initial contact with Lady of America was with International Franchise Sales Director Charles Cavuoto ("Cavuoto").

183.   Weeks contacted Cavuota in or about the first two weeks of July 2001.

184.   During the course of their conversations, Cavuoto encouraged and subsequently convinced Weeks to attend "Discovery Day" in Fort Lauderdale, Florida.

185.   At the close of their conversations, Cavuota forwarded Hoglund-Ross and Weeks' information onto Mark Camara ("Camara"), the Director of Real Estate, ensuring Hoglund-Ross and Weeks that Camara would find the best location for their fitness club, and negotiate aggressively the most advantageous lease terms available.

186.   In light of the results of their on-line investigation of the Lady of America franchise concept and their discussions with Cavuota, Hoglund-Ross and Weeks signed up to attend "Discovery-Day" in Fort Lauderdale, Florida on August 13-15, 2001.

187.   The "Discovery Day" presentation included a series of presentations regarding the success of other franchisees suggesting that these existing franchisees were all turning a profit.

188.   During "Discovery Day" Lady of America representatives commented:

   a.   Hoglund-Ross would be driving a Mercedes in 6 months;

   b.   rent per month would be approximately $14.00 per square foot when in fact it was $16.00 per square foot; and

   c.   provided Hoglund-Ross and Weeks with names of people to call regarding their experience with Lady of America.

31

189.    At "Discovery Day" Landman, Cavuota and Larry Sargent all confirmed the above-described information Hoglund-Ross and Weeks located on Lady of America's website.

190.    All of the above-described statements by Lady of America were made to Hoglund-Ross and Weeks in order to induce Hoglund-Ross and Weeks to invest in a Lady of America franchise concept.

191.    Lady of America presented Hoglund-Ross and Weeks with the Uniform Franchise Offering Circular ("UFOC") attached hereto as Exhibit E in or about August, 2001.

192.    Item 19 of the UFOC received by Hoglund-Ross and Weeks states that Lady of America ". . . does not furnish or authorize its salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of your Franchise.  Actual results vary from Franchise to Franchise, and we cannot estimate the results of any particular franchise." (See the UFOC presented to Hoglund-Ross and Weeks at page 58).

193.    Item 19 is inaccurate in that Lady of America representatives, as described herein, make a practice of making "earnings claims" outside the context of the UFOC (i.e., illegal "earnings claims").

194.    Upon information and belief, Lady of America also failed to disclose in the UFOC the full extent of the vendor rebates and/or premiums which Lady of America receives from vendors with whom franchisees, including Hoglund-Ross and Weeks, have dealt at the direction of Lady of America.  (All information related to such vendor rebates is required to be disclosed at Item 8 of the UFOC).

195.    Upon information and belief, Hoglund-Ross and Weeks signed a written franchise agreement with Lady of America in or about November 21, 2001 pursuant to which Hoglund-Ross

and Weeks were given the right to operate a "Ladies Workout Express" in Columbia Heights, Minnesota.

196.    Hoglund-Ross and Weeks also made a payment of $12,500 in or about the end of November 2001 for the right to develop a franchised "Ladies Workout Express" location in Columbia Heights, Minnesota.

197.    Hoglund-Ross and Weeks opened the "Ladies Workout Express" in Columbia Heights, Minnesota in or about February, 2002.

198.    Hoglund-Ross and Weeks were the first "Ladies Workout Express" to open in the State of Minnesota.

199.    The start-up costs for the Columbia Heights, Minnesota "Ladies Workout Express" franchise was substantially more ($41,000) than the cost estimates provided to Hoglund-Ross and Weeks by Lady of America ($18,900) prior to investment in the franchise.

200.    In or about January 2003, Hoglund-Ross and Weeks opened a second "Ladies Workout Express" in New Brighton, Minnesota.

201.    The promised revenues and costs never materialized for either the Columbia Heights or New Brighton, Minnesota "Ladies Workout Express."

202.    Over the course of operation of both franchises, Hoglund-Ross and Weeks' franchise did not achieve pre-grand opening sales of even close to $100,000 as promised by Lady of America.

203.    Despite repeated requests, Lady of America failed to make good on its promises to: (a) provide meaningful assistance with the franchise opening; and (b) reduce Hoglund-Ross and Weeks' royalties by 50% (10% to 5%).

204.    After Hoglund-Ross and Weeks spent time and effort training its manager in accordance with the requests of Lady of America, Lady of America induced Hoglund-Ross and Weeks' manager into leaving the Columbia Heights "Ladies Workout Express" and to serve as manager within a new "Ladies Workout Express."

205.    Neither Hoglund-Ross and Weeks' "Ladies Workout Express" nor other Lady of America franchise concepts operated within the State of Minnesota have competed favorably with the local fitness centers which operate exclusively for women.

206.    Hoglund-Ross and Weeks seek damages based upon the above-described conduct of Lady of America.

207.    Hoglund-Ross and Weeks also seek damages from Defendant Wittenberg who is, upon information and belief, the "control person" orchestrating Lady of America's deceptive sales practices.

## BACKGROUND FACTS RELATED TO EVANS' INVESTMENT IN LADY OF AMERICA'S "LADIES WORKOUT EXPRESS" FRANCHISE SYSTEM

208.    Evans first began investigating the prospect of owning and operating a health club franchise during Summer 2002.

209.    Evans had a particular interest in operating a fitness club exclusively for use by women.

210.    Evans initiated due diligence with respect to a number of franchise concepts.

211.    Evans was familiar with the popular "Curves" franchise system operated by Curves International, Inc.

34

212.    The Curves franchise system calls for the operation of a fitness center exclusively for women emphasizing a 30 minute circuit training regimen.

213.    Evans spoke with a representative of the Curves system in Summer 2002 about the possibility of opening a franchised location but was told that no franchised locations of that system were available for operation within the State of Minnesota.

214.    At or about the same time, Evans also began reviewing the possibility of opening a "Ladies Workout Express" franchise through Lady of America.

215.    Like the Curves concept that Evans looked at, the "Ladies Workout Express" franchise concept involves the operation of fitness centers exclusively for women emphasizing a 30 minute circuit training regimen.

216.    As more fully set forth herein, Lady of America representatives made a host of fraudulent misrepresentations to Evans in order to induce her into investing in Lady of America's franchise system.

*217.*    Lady of America also failed to fully disclose the extent and nature of the vendor rebates that Lady of America planned to and would accept once Evans invested in Lady of America's franchise system.

218.    Evans' initial contact with Lady of America was with Elliot Melement ("Melement").

219.    Evans contacted Melement in Summer of 2002.

220.    During the course of their initial telephone conversation, Melement represented to Evans that, in the event that Evans purchased a "Ladies Workout Express" franchise:

      a.    pre-sale would be easy and that the first 100 members would be in place before Evans even opened her door;

35

    b.   Evans would do very well as the other Minnesota "Ladies Workout Express" locations were very successful;

    c.   Evans would not have to worry about competition from Curves because "Ladies Workout Express" was a better franchise;

    d.   Lady of America would assist Evans in finding a location and negotiate a favorable lease on Evans' behalf; and

    e.   Evans would receive start-up and ongoing support and assistance before and after opening the "Ladies Workout Express" franchise location.

221.    Melement further indicated that if Evans was serious about opening a "Ladies Workout Express" that she better move fast because Minnesota was a "hot market," and therefore franchise locations within Minnesota were limited.

222.    At the close of their conversation, Melement directed Evans to contact Lady of America representatives Mark Camara ("Camara") and Larry Sargent ("Sargent") for further information regarding franchise opportunities.

223.    In Evans' subsequent conversations with Camara, in Summer 2002, Camara confirmed all of the above-described statements made by Melement.

224.    In particular, Camara, as Melement had previously done, cautioned Evans that she should purchase a "Ladies Workout Express" franchise opportunity within the State of Minnesota, but only so long as she acted quickly to secure a franchise because the remaining franchise locations within the State of Minnesota were being booked quickly by other prospective franchisees.

225.    In response, Evans suggested several areas to Camara where she wanted to open her "Ladies Workout Express," however, Camara turned down all of her suggestions stating that they

had no sites in mind there.  Instead, Camara suggested that Evans locate her "Ladies Workout Express" in Blaine, Minnesota and subsequently told Evans that she better act fast as another Lady of America franchisee, Allanson, was ready to sign on it.  After Evans had purchased her Roseville, Minnesota location, Evans spoke with Allanson and Allanson stated that she had never even talked to Lady of America about the Blaine, Minnesota location.

226.    Both Camara and Sargent repeatedly (and favorably) compared its "Ladies Workout Express" concept with the similar franchised concept marketed by Curves International, Inc.

227.    Furthermore, Sargent indicated that Lady of America was planning several nationwide advertising plans that would help push the "Ladies Workout Express" concept ahead of other franchise concepts operated in the State of Minnesota, including, but not limited to, the "Curves" concept.

228.    All of the above-described statements by Lady of America representatives were made to Evans in order to induce Evans to invest in a Lady of America franchise concept.

229.    Evans reasonably relied on the foregoing representations by Lady of America in making her decision to invest in the Lady of America franchise concept.

230.    Lady of America presented Evans with the Uniform Franchise Offering Circular ("UFOC") attached hereto as Exhibit F in or about October 2002.

231.    Item 19 of the UFOC received by Evans states that Lady of America does ". . . not furnish or authorize its salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of your Franchise.  Actual results vary from Franchise to Franchise, and we cannot estimate the results of any particular franchise."  (See the UFOC presented to Evans at page 57.)

232.    Item 19 is inaccurate in that Lady of America representatives, as described herein, make a practice of making "earnings claims" outside the context of the UFOC (i.e., illegal "earnings claims").

233.    Upon information and belief, Lady of America also failed to disclose in the UFOC the full extent of the vendor rebates and/or premiums which Lady of America receives from vendors with whom franchisees, including Evans, have dealt with at the direction of Lady of America.  (All information related to such vendor rebates is required to be disclosed at Item 8 of the UFOC.)

234.    Instead of building up her own club, Evans decided to purchase an existing club in Roseville, Minnesota.

235.    Upon information and belief, Evans signed a written franchise agreement with Lady of America, which was transferred over from the existing franchisee, in or about November 2002 pursuant to which Evans was given the right to operate a "Ladies Workout Express" in Roseville, Minnesota.

236.    Evans made a payment of $5000 for the transfer of this location.

237.    Evans also made a payment of $12,500 in or around November 2002 as a franchise fee for the Roseville, Minnesota "Ladies Workout Express" franchised location.

238.    Evans opened the "Ladies Workout Express" location in Roseville, Minnesota in or about November 2002.

239.    After buying an existing "Ladies Workout Express" in Roseville, Minnesota, Evans received no training and did not receive an invitation to attend "Discovery Day."

240.    Moreover, the promised customer base and revenues never materialized for Evans' Roseville, Minnesota franchise.

241.    Specifically, Evans did reach 100 customers; however, Evans never broke-even as represented by Lady of America.

242.    Despite repeated requests for assistance to Sargent, Lady of America failed to make good on its promises to: (a) provide meaningful assistance with the franchise opening; or (b) provide national and local advertising.

243.    Neither Evans' "Ladies Workout Express" nor other Lady of America franchise concepts operated within the State of Minnesota have competed favorably with the local Curves International, Inc. franchises.

244.    All Minnesota "Ladies Workout Express" franchisees suffered from the lack of name recognition for the concept; upon information and belief, "Ladies Workout Express" franchisees would have enjoyed substantially more name recognition had Lady of America made good on its promises of national and local advertising assistance.

245.    Evans seeks damages based upon the above-described conduct of Lady of America.

246.    Evans also seeks damages from Defendant Wittenberg who is, upon information and belief, the "control person" orchestrating Lady of America's deceptive sales practices.


## PLAINTIFFS' CURRENT SITUATION

247.    The Wrights, Allanson, Randall, Neudecker, Hoglund-Ross, Weeks, and Evans have each been left on the verge of bankruptcy based on the above-described wrongful conduct of Lady of America.

248.    The Wrights, Allanson, Randall, Neudecker, Hoglund-Ross, Weeks, and Evans invested vast sums of money in the Lady of America system.

249.     Each franchise in which the Wrights, Allanson, Randall, and Neudecker invested has, now, closed; upon information and belief, roughly half of the approximately 26 Lady of America-operated franchises that existed as of the end of 2002 have closed.

250.     Plaintiffs retained Dady & Garner, P.A. in July and October 2004 to review their respective franchise relationships with Lady of America.

251.     After consulting with Dady & Garner, P.A., the Plaintiffs learned of their right to seek rescission damages based on the above-described conduct of Lady of America.

252.     Plaintiffs have, accordingly, filed this action seeking relief from Lady of America for its violations of statutory and common law duties to Plaintiffs.

253.     By reason of Lady of America's breaches, misrepresentations, and violations of state law, the Plaintiffs have suffered damages which they, now, seek to recover from Lady of America and Wittenberg.

<u>**COUNT I**</u>
<u>**VIOLATION OF THE MINNESOT FRANCHISE ACT**</u>
<u>**MINN. STAT. § 80C.01, ET. SEQ.**</u>
**(against both Lady of America and Wittenberg)**

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

254.     Lady of America sold each Plaintiff a Afranchise≅ opportunity as defined by the Minnesota Franchise Act, Minn. Stat. § 80C.01 et seq.

255.     Lady of America is a franchisor as defined by the Minnesota Franchise Act. Minn. Stat. § 80C.01, subd. 6.

256.    The Minnesota Franchise Act governs the relationship between the parties as the franchises in which each Plaintiff invested was located in and operated in the State of Minnesota. Minn. Stat. § 80C.19, subd. 1.

257.    The Minnesota Franchise Act incorporates an "anti-waiver" provision which specifies that any purported waiver of rights under the Act (e.g., via a contractual choice of law clause) is void. Minn. Stat. § 80C.21.

258.    The parties' respective franchise agreements, in any event, incorporate an addendum calling for application of the Minnesota Franchise Act to the relationship between the parties.

259.    Under the Minnesota Franchise Act, a franchisor may not:

. . . offer or sell a franchise in this state by means of any written or oral communication which includes an <u>untrue statement of a material fact or which</u> omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

Minn. Stat. § 80C.13, subd. 2 (emphasis added).

260.    Under the Minnesota Franchise Act, no person may "offer or sell" a franchise without having properly registered with the State of Minnesota.  Minn. Stat. § 80C.02.

261.    To the extent that a franchisor intends to make any projection of the "estimated or projected franchisee earnings" associated with the operation of the franchise, such projection is to be set forth in the Uniform Franchise Offering Circular (or "UFOC") issued by the franchisor to the prospective franchisee.  Minn. Stat. § 80C.04, subd. 1(p).

262.    It is unlawful, under the Minnesota Rules promulgated pursuant to the Minnesota Franchise Act by the Minnesota Department of Commerce, for a franchisor to make or cause to be made any statement or representation that is contrary to any disclosure made in the public offering

41

statement (i.e., the Uniform Franchise Offering Circular or "UFOC").  Minn. Rule 2860.4500(B)(1);

see also 16 C.F.R. Part 436 (stating that, to the extent that a franchisor disavows any intention of

making a statement regarding estimated or projected franchisee earnings associated with the

operation of the franchise in the UFOC, the franchisor may not make a separate prediction of such

earnings to the prospective franchisee).

263.    It is, furthermore, unlawful for a franchisor to make or cause to be made "projections

of operations or of income or gross or net profits capable of being obtained from operation of the

franchise by the franchisee without written disclosure of the number of the franchisor's existing

franchised businesses that have, to the franchisor's knowledge, actually attained that projected level."

 Minn. Rule 2860.4500(B)(2)(b).

264.    A franchisor is prohibited from making any statement or representation that "other

individuals are willing to enter into a franchise agreement substantially similar to that being offered,

granted, or sold without, at the same time, disclosing in writing the source of such information and

the names, addresses, and telephone numbers of such individuals."  Minn. Rule 2860.4300, subpart

2(B).

265.    A franchisor must identify in the Uniform Franchise Offering Circular any rebate, fee,

or income derived from a third party (e.g., a vendor) with whom the franchisee does business.  Minn.

Rule 2860.3500, subpart 7.

266.    The Uniform Franchise Offering Circulars received by Plaintiffs prior to signing their

respective franchise agreements (and/or personal guarantees) disavowed any intention on the part of

Lady of America to make a projection of likely earnings (i.e., "an earnings claim").

267.    Upon information and belief, the Uniform Franchise Offering Circulars received by

Plaintiffs prior to signing their respective franchise agreements (and/or personal guarantees) failed to

42

disclose the full amount of income which Lady of America would derive from Plaintiffs' purchase of supplies, equipment, and services from Lady of America's approved vendors.

268.    The failure by Lady of America to fully disclose the amount of income to be derived from Plaintiffs' operation of their respective franchises constitutes an "undisclosed vendor rebate" by Lady of America.

269.    Lady of America, through its actions in connection with the offer and sale of its franchises to Plaintiffs, has violated the Minnesota Franchise Act and the regulations (i.e., the "Minnesota Rules") issued pursuant thereto.  These actions on the part of Lady of America include, but are not limited to the following:

a.    Failing to maintain registration with the State of Minnesota;

b.    Making untrue statements of material fact regarding the franchise opportunities being offered to Plaintiffs prior to Plaintiffs' investing in their respective franchises, and failing to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c.    Making projections of the earnings to be made through the operation of the Lady of America franchises upon which Plaintiffs relied in making a decision to invest in their respective franchises;

d.    Making such projections outside of the Uniform Franchise Offering Circular format;

e.    Failing to provide a written factual basis and/or assumption underlying the above-described "earnings claims;"

f.      Failing to fully disclose to Plaintiffs, prior to their investing in the Lady of America franchise system, Lady of America's intention to accept vendor rebates; and

g.      Pressuring Plaintiffs into purchasing Lady of America franchises by representing to Plaintiffs, prior to their investment in the Lady of America franchise system, that unidentified third parties were either interested in or seeking to make a purchase of the particular franchised location being offered to Plaintiffs.

270.     Plaintiffs would not have invested in their respective Lady of America franchises had all material information regarding the franchise opportunity been properly disclosed to Plaintiffs' prior to their making their respective investments in the Lady of America system.

271.     Under Minn. Stat. § 80C.17(a), "[a] person who violates any provision of this chapter or any rule or order thereunder shall be liable to the franchisee or subfranchisor who may sue <u>for damages</u> caused thereby, for <u>rescission</u>, or <u>other relief</u> as the court may deem appropriate." (Emphasis added.)

272.     Under Minn. Stat. § 80C.17(a), the principal executive officer of the defendant franchisor may be held jointly and severally liable for the franchisor's conduct to the extent that such principal executive officer acted as a "control person."

273.     Upon information and belief, all of the conduct described herein by Lady of America was directed with the knowledge, approval, and aid of Defendant Wittenberg.

274.     As a direct and proximate result of Lady of America's violations of the Minnesota Franchise Act and the Minnesota Regulations, Plaintiffs have suffered damages and are entitled to

recover their damages from Lady of America in an amount to be determined at trial, but which amount significantly exceeds $75,000, together with costs, disbursements, and attorneys= fees.

275.    As a "control person," Defendant Wittenberg is jointly and severally liable for all such damages, costs, disbursements, and attorneys' fees.

276.    Plaintiffs are, moreover, entitled to rescission of any and all franchise or related agreements (e.g., personal guaranties issued in connection with the purchase of the above-described franchise opportunities).

<u>**COUNT II**</u>
<u>**VIOLATION OF THE FLORIDA FRANCHISE MISREPRESENTATION ACT**</u>
<u>**FLA. STAT. ANN. § 817.416**</u>

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

277.    The franchise agreements executed by the parties to this case call for the application of Florida law to the extent that the application of Florida law is not inconsistent with the Minnesota Franchise Act.

278.    Pursuant to the Florida Franchise Misrepresentation Act (Athe Act≅), Plaintiffs were franchisees of the "Lady of America" system of franchises.  Fla. Stat. Ann. § 817.416 (1)(b).

279.    By the terms of the Act, it is unlawful for a franchisor, when selling or otherwise establishing a franchise A[i]ntentionally to misrepresent the prospects or chances for success of a proposed or existing franchise . . . "  Fla. Stat. Ann. § 817.416 (2)(a)(1).

280.    It is also a violation of the Act, when selling or establishing a franchise "[i]ntentionally to misrepresent, by failure to disclose or otherwise, the known required total investment for such franchise . . ."  Fla. Stat. Ann. § 817.416 (2)(a)(2).

281.    Lady of America=s violations of Fla. Stat. Ann. § 817.416 include, but are not limited to, Lady of America's conduct in (prior to Plaintiffs' making their respective franchise investments):

a.  Misrepresenting the earnings (i.e., the "prospects or chances for success") to be had through the operation of the Lady of America franchises being offered to Plaintiffs prior to Plaintiffs' investing in their respective franchises; and

b.  Misrepresenting the total investment required for the operation of the Lady of America franchises being offered to Plaintiffs prior to Plaintiffs' investing in their respective franchises.

282.  Plaintiffs invested in their respective franchises based upon the misrepresentations of Lady of America.

283.  Plaintiffs would not have invested in their respective Lady of America franchises had Lady of America not made the above-described misrepresentations.

284.  As a direct and proximate result of Lady of America's conduct, Plaintiffs have been injured in their business in a number of ways, including, but not limited to, the following:

a.  Plaintiffs have been denied a legitimate expectancy arising from their agreements with Lady of America;

b.  In reliance upon the continuing support of their franchises, Plaintiffs expended and invested money, time, skill and effort, to market the franchises; and

c.  Lady of America has been unjustly enriched at the Plaintiffs' expense, in that Lady of America induced the Plaintiffs to invest in a system which offered none of the promised benefits and, consequently, no potential to reap the prospective benefits of entering into the license agreement which were a material inducement to Plaintiffs' investing in their respective franchises.

285.     Under the Florida Franchise Misrepresentation Act, "[a]ny person, who shows in a civil court of law a violation of this section may receive a judgment for all moneys invested in such franchise or distributorship.  Upon such a showing, the court may award any person bringing such action reasonable attorneys' fees and shall award such person reasonable costs incurred in bringing the action . . ."

286.     Plaintiffs are entitled: (a) to rescission; (b) to recover damages sustained as a consequence of Lady of America's violations of the Act; and (c) to costs and reasonable attorneys' fees.  Fla. Stat. Ann. § 817.416 (3).

287.     As a direct and proximate result of Lady of America's violations of the Act, Plaintiffs have incurred substantial business losses in an amount believed to be significantly in excess of $75,000, but which cannot, at this time, be exactly determined.  Such amount will be fully demonstrated at trial.

<b>COUNT III<br>VIOLATION OF THE FLORIDA DECEPTIVE AND<br>UNFAIR TRADE PRACTICES ACT<br>FLA. STAT. ANN. § 501.201, ET. SEQ.</b>

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

288.     The Florida Deceptive and Unfair Trade Practices Act (Athe Act≅), Fla. Stat. Ann. § 501.201, et. seq., is to be liberally construed to promote the protection of legitimate business enterprises from those who engage in unconscionable, deceptive, or unfair practices in the conduct of any trade or commerce.  Fla. Stat. Ann. § 501.202 (2).

289.     The franchise agreements executed by the parties to this case call for the application of Florida law to the extent that the application of Florida law is not inconsistent with the Minnesota Franchise Act.

290.    The Act declares A[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive practices in the conduct of any trade or commerce≅ to be unlawful.  Fla. Stat. Ann. § 501.204 (1).

291.    At all times material to this action, Plaintiffs were Aconsumer[s]≅ as that term is defined under the Act, Fla. Stat. Ann. § 501.203 (7).

292.    Lady of America's above-described conduct constitutes an unfair method of competition, unconscionable act or practice, and/or an unfair or deceptive practice for purposes of the Act.   Such conduct includes, but is not limited to, the following omissions, material misrepresentations, and violations of state law on the part of Lady of America:

       a.      Lady of America's violations of the Florida Franchise Misrepresentation Act as described supra;

       b.      Lady of America's failure to disclose vendor premiums earned on the sale of each of the Plaintiffs' magazine products; and

       c.      Lady of America's making of unfounded and unsupported "earnings claims."

293.    Lady of America failed to disclose material information, willfully withheld material information, and otherwise mischaracterized the nature of the Lady of America franchise system in order to induce Plaintiffs into investing in such franchises.

294.    Upon information and belief, the above-mentioned acts and practices by Lady of America were committed knowingly with actual awareness of the unfairness of the acts giving rise to Plaintiffs' claims.

295.    These acts and practices have been a producing cause of actual damages to Plaintiffs.

296.    In accordance with § 501.2105 of the Act, Plaintiffs seek to recover their reasonable and necessary attorneys' fees and all costs.

297.     As a direct and proximate result of the statutory violations of the Act, Plaintiffs have incurred substantial business losses and damages in an amount that cannot at this time be precisely determined, but that is alleged to significantly exceed $75,000. The precise amount of such damage will be demonstrated at a trial on the merits.

**COUNT IV**
**VIOLATION OF THE FLORIDA SALE OF BUSINESS OPPORTUNITY ACT**
**FLA. STAT. ANN. § 559.80, ET. SEQ.**

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

298.     The franchise agreements executed by the parties to this case call for the application of Florida law to the extent that the application of Florida law is not inconsistent with the Minnesota Franchise Act.

299.     The Florida Sale of Business Opportunities Act (the "Act"), Fla. Stat. Ann. § 559.80, et. seq., requires that, at least three days prior to the time a prospective purchaser of a business opportunity signs a business opportunity contract or three days prior to the seller's receipt of consideration (whichever occurs first), the seller must provide the prospective purchaser the disclosure document described in § 559.803 of the Act.

300.     A "business opportunity" means a sale for an initial consideration of more than $500 of products, equipment, supplies, and/or services that will be used by the purchaser to start a business where the seller provides a sales and marketing program for the sale of same.  Fla. Stat. Ann. § 559.80.

301.     A "business opportunity" does not include "an arrangement defined as a franchise by 16 C.F.R. Section 436.1, et. seq., only <u>IF</u> the franchisor complies in all material respects with the Federal Trade Commission Rule (i.e., 16 C.F.R. Part 436).  Fla. Stat. Ann. § 559.802.

302.     Lady of America is a seller of a business opportunity within the meaning of the Act in that Lady of America sold the above-described franchises without having previously provided Plaintiffs with a Uniform Franchise Offering Circular that complied, in all material respects, with 16 C.F.R. Part 436.

303.     It is a violation of the Act for the seller of a business opportunity: to misrepresent, by failure to disclose or otherwise, the known required total investment for such business opportunity; to misrepresent the amount of profits, net or gross, which the purchaser can expect from the operation of the business opportunity; or to misrepresent a material fact or create a false or misleading impression in the sale of the business opportunity. Fla. Stat. Ann. § 559.809 (1), (5), and (13).

304.     Lady of America violated the Act by misrepresenting to Plaintiffs (prior to their purchase of the business opportunity) the projected profits to be earned through operation of the business and the required investment in the business opportunity.

305.     Lady of America further violated the Act by making statements "concerning sales or earnings or a range of sales or earnings that may be made through" the business opportunity without simultaneously disclosing the total number of purchasers of such business opportunities who have actually achieved the claimed level of sales or earnings. Fla. Stat. Ann. § 559.803 (10).

306.     Had Lady of America made the required disclosures, Plaintiffs would not have purchased their respective Lady of America franchises (or executed personal guaranties thereof).

307.     As a direct and proximate result of Lady of America's violations of the Act, Plaintiffs have suffered damages and are entitled to recover those damages from Lady of America in an amount to be determined, together with costs, disbursements, and attorneys= fees.

308.    Plaintiffs are, moreover, entitled to rescission of any agreements with Lady of America.

## COUNT V
## DECLARATORY JUDGMENT

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

309.    Rescission is appropriate relief under the Minnesota Franchise Act, the Florida Franchise Misrepresentation Act, the Florida Sale of Business Opportunity Act and the common law of the State of Florida.

310.    The conduct by Lady of America in inducing Plaintiffs to serve as franchisees/guarantors and to make substantial investments of time and money in reliance on Lady of America=s unjustified representations to Plaintiffs constitutes a prior material breach of contract or nullifies the parties= contract and excuses Plaintiffs from any further performance thereunder.

311.    Plaintiffs request that this Court enter declaratory judgment consistent with the foregoing.

312.    Plaintiffs further request a declaration that any and all monetary claims by Defendant Lady of America against Plaintiffs be dismissed as inconsistent with Plaintiffs' rescission rights.

## COUNT VI
## BREACH OF CONTRACT AND THE
## COVENANT OF GOOD FAITH AND FAIR DEALING

The Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

313.    In the event that the Court does not rescind the parties= agreements and declare them null and void, Plaintiffs alternatively allege that Lady of America's actions, as set forth above, constitute a breach of contract and/or a violation of the implied covenant of good faith and fair dealing implied by law.

314.     As a direct and proximate result of Lady of America's conduct, Plaintiffs have been, will be, and will continue to be, injured in their businesses in a number of ways, including, but not limited to, the following:

     a.     Plaintiffs have been denied a legitimate expectancy arising from their agreements with Lady of America;

     b.     Plaintiffs expended and invested money, time, skill and effort, to market the Lady of America product; and

     c.     Lady of America has been unjustly enriched at the Plaintiffs' expense, in that Lady of America induced Plaintiffs to invest in a system which offered none of the promised benefits and, consequently, no potential to reap the prospective benefits of entering into the franchise relationship which were a material inducement to Plaintiffs' becoming franchisees/guarantors.

315.     As a direct and proximate result of Lady of America's conduct, Plaintiffs have been damaged in an amount which significantly exceeds $75,000 dollars. The precise amount of damages will be demonstrated at a trial on the merits.

## COUNT VII
## UNJUST ENRICHMENT

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

316.     The conduct by Lady of America in inducing Plaintiffs to serve as franchisees/guarantors and to make substantial investments of time and money in reliance on Lady of America's unjustified representations to Plaintiffs constitutes unjust enrichment.

317.     The amount of damages by which Lady of America has been unjustly enriched, and the amount which Plaintiffs are, or will be, entitled to recover cannot now be exactly determined.

Such damages are alleged to significantly exceed $75,000, and will be fully demonstrated at a trial on the merits.

## COUNT VIII
## FRAUD

Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

318.    The conduct by Lady of America in inducing Plaintiffs to serve as franchisees/guarantors and to make substantial investments of time and money in reliance on Lady of America's unjustified representations to Plaintiffs constitutes fraud.

319.    The above-described statements made by Lady of America representatives, in order to induce Plaintiffs to invest in Lady of America-operated franchises, were both false and willfully made with knowledge of their falsity.

320.    Plaintiffs have been damaged by the fraud perpetrated by Lady of America.

321.    The amount of damages by which Lady of America has been unjustly enriched, and the amount which Plaintiffs are, or will be, entitled to recover cannot now be exactly determined. Such damages are alleged to significantly exceed $75,000, and will be fully demonstrated at a trial on the merits.

## DEMAND FOR JURY

322.    Plaintiffs demand a jury trial.

## PRAYER

**WHEREFORE**, Plaintiffs respectfully request the following relief:

1.    Award Plaintiffs their full amount of actual damages;

2.      Award Plaintiffs rescission damages in the amount of their investment in the "Ladies

Workout Express" brand franchises;

3.      A declaratory judgment excusing Plaintiffs from any further obligation to Lady of

America under the alleged agreements, including but not limited to, any franchise

agreement or guaranty thereof;

4.      A declaratory judgment granting Plaintiffs rescission of any contractual relationship

with Lady of America;

5.      Award Plaintiffs their complete costs, disbursements and reasonable attorneys= fees

incurred herein, to the extent authorized under applicable law; and

6.      Award Plaintiffs such other and further relief as the Court may deem just and

appropriate.


DATED:  March 18, 2005                    **DADY & GARNER, P.A.**



By**:  /s/ John D. Holland**
                    J. Michael Dady
                    John D. Holland
4000 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 359-9000

**ATTORNEYS FOR PLAINTIFFS**